UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIANNE T.,[1] | ) |
| | ) No. 22 CV 2411 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Magistrate Judge Young B. Kim |
| LEE DUDEK, Acting Commissioner of Social Security, | ) |
| | ) |
| | ) March 17, 2025 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Dianne T., who has a history of periodic homelessness and alcohol abuse, seeks disability insurance and social security income benefits ("DIB" and "SSI," respectively) asserting that she is disabled because of several conditions related to her spine and knees, depression, and anxiety. She brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for benefits. For the following reasons, Dianne's remand request is granted:

**Procedural History**

Dianne filed DIB and SSI applications in October 2018 claiming disability onset on August 1, 2018. (Administrative Record ("A.R.") 153.) After her applications were denied initially and upon reconsideration at the administrative level, (id. at 92-149), she sought and was granted a hearing before an Administrative Law Judge

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Dianne's first name and last initial in this opinion to protect her privacy to the extent possible.

("ALJ"), (id. at 210-11, 232). Dianne appeared with her attorney at a May 2020 telephonic hearing at which she and a vocational expert ("VE") testified. (Id. at 64-91.) The ALJ then ruled in July 2020 that Dianne is not disabled. (Id. at 153-63.) The Appeals Council granted Dianne's request for review and remanded the matter back to the ALJ. (Id. at 170-74.)

The ALJ held a second hearing on July 15, 2021, at which Dianne and a VE again testified. (Id. at 39-62.) Later that month the ALJ found against Dianne. (Id. at 10-30.) The Appeals Council denied Dianne's request for a review, (id. at 1-6), making the ALJ's second decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Dianne then filed this action seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

## Analysis

Dianne argues that the ALJ erred by: (1) relying on the opinions of state agency consultants because they were based on outdated information; (2) finding her capable of sitting for six hours during a workday; (3) deeming Advanced Practice Registered Nurse[2] ("APRN") Ann Scoigletti's opinion unpersuasive; (4) finding that Dianne can perform past relevant work; and (5) incorrectly assessing her subjective symptom allegations. (See generally R. 14, Pl.'s Mem.) When reviewing the ALJ's decision, the

---

[2] According to the American Nurses Association, "APRNs are nurses who have met advanced educational and clinical practice requirements, and often provide services in community-based settings. APRNs' services range from primary and preventive care to mental health to birthing to anesthesia." See https://www.nursingworld.org/practice-policy/workforce/what-is-nursing/aprn/ (last visited March 10, 2025).

court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). However, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021), and "provide an explanation . . . 'sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review,'" *Warnell v. O'Malley,* 97 F.4th 1050, 1054 (7th Cir. 2024) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). Having considered the arguments and record under this standard, the court finds that remand is warranted here.

**A.  Opinion Evidence**

The court turns first to Dianne's arguments concerning the opinion evidence, because any error there would require a reassessment of her residual functional capacity ("RFC"). An ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must assess the persuasiveness of all medical opinions by considering and explaining the most important factors—supportability and

3

consistency. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires consideration of the objective medical evidence and explanations presented and used by the medical source. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor directs the ALJ to consider and explain how the opinion is consistent with all other medical and nonmedical sources. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ also may, but is not required to, explain how he considered the medical source's specializations and relationship with the claimant and any other factors that tend to support or contradict the source's opinion. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2).

The ALJ here found the opinions of the state agency consultants "persuasive," and those of Dianne's treating provider, APRN Scoigletti, "unpersuasive." (A.R. 28.) The state agency consultants found in March and October 2019 that Dianne can: lift 20 pounds occasionally and 10 pounds frequently; stand or walk for 2 hours and sit for 6 hours in a workday; occasionally climb ladders, ropes, scaffolds, ramps, and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. (Id. at 98-99, 108-09, 126-27, 143-44.) The consultants also concluded that Dianne's depression and anxiety render her at most mildly limited under the paragraph B criteria of interacting with others, adapting or managing herself, and concentrating, persisting or maintaining pace ("CPP"), and that her mental impairments do not cause functional limitations. (Id. at 96-97, 106-07, 123-24, 140-42.)

In contrast, Scoigletti opined in July 2019 that during an 8-hour workday Dianne: can sit and stand for 10 minutes at a time, sit and stand/walk for less than 2

4

hours total, and rarely lift less than and never more than 10 pounds; must walk every 10 minutes for 2 minutes, take 10-15 minute breaks every 1-2 hours for pain and fatigue, elevate her legs to waist-level for 75% of the day, and use a cane and knee and back braces when standing or walking; and has significant limitations reaching, handling, or fingering on both sides. (Id. at 1202-04.) Scoigletti also indicated that Dianne must be able to shift at will from sitting, standing, or walking, is likely to have "all bad days," and her pain or other symptoms would "constantly" interfere with performing even simple work tasks. (Id.)

The ALJ ultimately adopted an RFC that largely tracks the consultants' opinions, finding Dianne capable of performing light work except:

> she can lift/carry 20 pounds occasionally and 10 pounds frequently; she can sit for a total of six hours and stand and walk for a total of two hours per workday; can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can frequently balance; and can occasionally stoop, kneel, crouch and crawl.

(Id. at 20.) The ALJ also found that Dianne is mildly limited in interacting with others and adapting or managing herself, and that she has no CPP limitations. (Id. at 19-20.)

Dianne argues that the ALJ erred by relying on the consultants' opinions because they are premised on outdated information. (R. 14, Pl.'s Mem. at 5-8; R. 16, Pl.'s Reply at 1-3, 5-6.) She says the consultants did not consider most of the notes from her psychotherapy sessions, which began in October 2019, or her April 2021 CT scan—which revealed a vertebral fracture—and asserts that this new information could have changed their opinions. (R. 14, Pl.'s Mem. at 5-7.)

5

"An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir.), *as amended on reh'g* (Apr. 13, 2018). "But older assessments can still constitute 'substantial evidence'" where new tests "do not 'necessarily undermine [previous medical] conclusions.'" *Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023) (quoting *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021)). Thus, if the new medical tests are not "highly complex," an ALJ generally may rely on prior administrative findings and later-submitted treatment records to assess the RFC. *See Durham v. Kijakazi*, 53 F.4th 1089, 1094-95 (7th Cir. 2022); *Aaron P. v. O'Malley*, No. 22 CV 6254, 2024 WL 3566638, at *4 (N.D. Ill. July 29, 2024). No new diagnosis, test, or other evidence concerning Dianne's mental or physical health requires remand here.

As for Dianne's mental health, the record does not reflect any mental exams that would require further evaluation. (See generally R. 14, Pl.'s Mem.; R. 16, Pl.'s Reply.) And her suggestion that the ALJ and consultants effectively ignored her major depressive disorder diagnosis is unfounded. (R. 16, Pl.'s Reply at 2.) Indeed, the ALJ referenced and considered Dianne's 2014 depression diagnosis, as did the consultants. (See A.R. 17; see also id. at 122 (September 2019 state agency consultant determination noting "Unspecified Depressive Disorder" and referring to consultative examination reflecting same).)

Moreover, the ALJ reviewed the therapy notes to which Dianne points, along with other evidence post-dating the consultants' opinions—and contrary to Dianne's

6

suggestion that the ALJ looked only at "snapshots" in time, (R. 16, Pl.'s Reply at 1), he acknowledged Dianne's "reports of waxing and waning symptomology," (A.R. 18). But the ALJ also noted that the "bulk" of Dianne's treatment records "show [her] condition generally remains stable and under good control with compliant medication management" and counseling. (Id. at 17-18.) Substantial evidence supports that assessment. (See, e.g., id. at 2080 (March 2020 therapy notes reflecting Dianne was not "too depressed" or "too anxious" before the pandemic and was a "bit worried" and "scared" about pandemic yet "getting a good response to meds"); id. at 2086 (May 2020 therapy notes indicating Dianne "has not been feeling depressed" or "too anxious"); id. at 2093 (July 2020 therapy notes reflecting Dianne "remain[s] hopeful" and is "coping with ongoing stressors"); id. at 2107 (September 2020 therapy notes indicating Dianne reported feeling depressed but "presented within normal limits"); id. at 2118 (November 2020 therapy notes indicating Dianne "presented within normal limits"); 2049-55 (February-March 2021 therapy notes reflecting Dianne "presented within normal limits").) Further, while Dianne insists that newer evidence reflects symptoms that may have caused the consultants to reassess their opinions, (R. 14, Pl.'s Mem. at 5-6), the ALJ reviewed and discussed many of the same records and determined otherwise. Having sufficiently explained "how the evidence [led] to [his] conclusions," *Warnell,* 97 F.4th at 1054, the ALJ's assessment stands.[3]

---

[3] Dianne further complains that the ALJ relied on the fact that she did not start treatment until October 2019 to deem her mental health conditions non-severe, without exploring reasons for the delay. (R. 16, Pl.'s Reply at 1.) This argument also falls flat. The ALJ cited ample evidence—including Dianne's own comments—reflecting that she had been doing relatively well before starting therapy.

7

Dianne's complaints about the opinions on her physical limitations fare no better. First, she says the ALJ erred in adopting the consultants' postural limitations because the consultants did not review the April 2021 CT scan, resulting in the improper interpretation of "raw diagnostic findings" by the ALJ. (R. 14, Pl.'s Mem. at 8 (citing A.R. 1960, 1974).) Generally, a CT scan must be interpreted by a doctor and not by an ALJ. *Bakke*, 62 F.4th at 1067. But when concluding that the CT scan did not alter his assessment of the opinion evidence, the ALJ noted that Dianne's providers apparently did not find them concerning. (See A.R. 26 (noting Dianne did not "require any surgical intervention," "aggressive therapy," or "pain injection" for vertebral fracture).) The ALJ also recounted Dianne's June 2021 reports that despite continuing lumbar pain, she was "healing fine" and "improving" without heat, ice, topical rubs, or physical therapy, and that she denied joint pain. (Id. (citing id. at 1923, 1925-26, 2068).) Given the minimal treatment and reported improvement soon after the scan and diagnosis, the ALJ did not err by relying on the consultants' opinions. *See Bakke*, 62 F.4th at 1067 (holding that providers' "mild reactions" to intervening CT scan demonstrate ALJ was entitled to rely on opinions of state agency consultants who had not reviewed it).

---

(See A.R. 18 (citing id. at 2080 (March 2020 therapy notes reflecting Dianne's report that she was "okay" and not "too depressed" or anxious before pandemic); see also id. at 17-18 (citing id. at 910 (February 2019 consultative exam indicating memory and mentation "normal" and denial of "psychiatric care or suicidal attempts"), id. at 1269-70 (September 2019 psychological consultative exam indicating Dianne "related in a coherent and linear manner," was "cooperative and compliant," and "did not manifest significant symptoms of mood or psychotic mental illness").)

Nor did the ALJ improperly assess other opinions regarding Dianne's physical limitations. To be sure, Dianne says that none of the ALJ's reasons for discounting APRN Scoigletti's opinion was sound, and that he: cherry-picked a treatment note indicating Dianne walked throughout the day; held against Dianne the fact that Scoigletti did not treat Dianne regularly while honoring the opinions of the consultants who never examined her; and faulted Scoigletti for failing to reference physical exams or objective findings to support her conclusions while ignoring the imaging and diagnoses she did cite. (R. 14, Pl.'s Mem. at 9-10.) But the ALJ addressed both required factors, finding Scoigletti's opinion neither properly supported nor consistent with the record as a whole. (A.R. 22-28.) Substantial evidence supports that assessment.

Indeed, far from cherry-picking, the ALJ points out that during the relevant period "a good portion" of Dianne's treatment consisted of "emergency department visits for alcohol intoxication" and falls related thereto. (See A.R. 28 (citing id. at 928-1201, 1220-68 (2019 emergency room records revealing unremarkable musculoskeletal exams)).) Those same records do not always reference back or knee pain and indicate that Dianne denied such pain during the period when Scoigletti submitted her July 2019 opinion. (See, e.g., id. at 1101 (June 2019 emergency room note that Dianne fainted after "drinking multiple margaritas," but had normal strength and range of motion and "feels fine"), 1236 (September 11, 2019 emergency room note that Dianne is an alcoholic who fell but denied back pain and had no back or lower extremity issues on exam), 1259 (September 13, 2019 emergency room note

9

reflecting "[n]o headache neck pain back pain" and not taking pain medications).) The ALJ also points to conflicting information about Dianne's use of assistive devices and notes that she had "little treatment or follow up for her back or knees" after an October 2018 back surgery. (Id. at 22-23.)

Moreover, Scoigletti's own notes reflect that her visits with Dianne in 2019 largely involved unrelated issues and mostly normal physical examinations of her back and lower extremities. (See, e.g., id. at 1847-69.) And when Dianne complained to Scoigletti about back pain six weeks before her opinion, Scoigletti advised only NSAIDs and "heat to area when able," recording "normal" gait and muscle strength. (Id. at 25 (citing id. at 1860-61).) Scoigletti's own notes therefore do not support, and are not consistent with, the marked sitting and walking limitations she assessed. The government is correct that the evidence Scoigletti cites for support is limited to diagnoses and imaging that does not easily translate to particular functional limitations. (R. 15, Govt.'s Mem. at 9 (citing A.R. 1202 (Scoigletti's opinion noting "xray advance [sic] osteoarthritis, multiple falls w/ injury (vertebral fracture, lacerations)")); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(C)(3)(a)(c) ("findings on imaging or other diagnostic tests" not a "substitute for findings on physical examination" in determining level of functioning). In any case, the ALJ considered such evidence, (A.R. 22-23, 26), and determined it did not require a different result. This was not error.

Finally, Dianne is correct that the ALJ discounted Scoigletti's opinion because she examined Dianne "very little" during the relevant period yet failed to note that

10

the consultants did not examine Dianne at all. (Id. at 28.) But frequency of treatment was not the only factor considered, and the ALJ cited substantial evidence supporting his conclusion that the consultants' opinions were persuasive and Scoigletti's opinion was not. The court cannot direct Dianne's preferred result. *See Deborah M.*, 994 F.3d at 788 (stating that the court will not reweigh evidence).

**B.  Subjective Symptom Assessment**

Dianne also complains that the ALJ conducted an improper subjective symptom assessment. An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). But the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and must consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). That said, the court will not disturb a symptom evaluation that is logically based on specific findings and evidence. *See Murphy*, 759 F.3d at 815. The ALJ's assessment passes muster here.

Dianne says the ALJ: failed to explain why the objective evidence did not support her allegations and ignored imaging and a state agency consultant's favorable finding in the process; held her "limited and conservative treatment" against her without explaining what more aggressive treatment could have helped, and failing to consider that her (temporary) homelessness may have been a barrier to more aggressive treatment options; and failed to explain the inconsistencies between

11

her allegations and daily living activities or consider her limits in performing those activities. (R. 14, Pl.'s Mem. at 12-14; R. 16, Pl.'s Reply at 12.) None of these arguments warrant remand.

First, the ALJ supplied substantial evidence to support his conclusion that Dianne's symptoms are not as limiting as she claims. (A.R. 25-26.) Indeed, the ALJ points out that Dianne required "little treatment or follow up for her back or knees" and often demonstrated normal findings on physical examination. (Id. at 23-27.) Nonetheless, Dianne argues that if the ALJ had considered certain imaging and a March 2019 consultant finding that Dianne's symptoms were supported by objective evidence alone, the symptom analysis would have tipped in her favor. (R. 14, Pl.'s Mem. at 13-14.) But as the government explains, "imaging is helpful for determining whether an impairment exists but considerably less so in determining . . . specific functional restrictions." (R. 15, Govt.'s Mem. at 13 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(C)(3)(a)(c) ("[W]e will not use findings on imaging or other diagnostic tests as a substitute for findings on physical examination about your ability to function, nor can we infer severity or functional limitations based solely on such tests.").) Regardless, the ALJ assessed more restrictions than the consultant whose opinion Dianne now promotes. (Compare A.R. 108-09 (consultant RFC stating Dianne can occasionally climb ladders, ropes and scaffolds) with id. at 20 (ALJ RFC prescribing that Dianne never climb ladders, ropes, or scaffolds).) The ALJ considered the opinion evidence and the imaging Dianne references, (id. at 23 (discussing February 2019 left knee x-ray), 25 (October 2018 right knee x-ray and

12

April 2021 CT scan)), but found more compelling Dianne's reports that pain was generally improving and was at times non-existent. This was not an error. *See Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (stating that courts will not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's" if substantial evidence supports it).

Next, the ALJ did not err in failing to consider whether and what more aggressive treatment would be helpful or acknowledging that homelessness may impact Dianne's ability to obtain that care. To be sure, the ALJ cited ample evidence showing that additional care simply was not needed. (See, e.g., id. at 26 (noting no complaints or treatment for degenerative disk disease after 2018 procedure and most emergency room visits were for falls while intoxicated); see also id. (citing id. at 1930-2030 (April 2021 hospital records for L2 vertebral fracture reflecting no recommendations for surgical intervention, aggressive therapy, or pain injection post discharge), id. at 2068 (June 7, 2021 report of "limited mobility" and back pain but "walking more without walker" and "healing fine"), id. at 1923-26 (June 15, 2021 visit reflecting muscle, back, and knee but no joint pain, as well as "normal movement, good tone," "normal gait," "not using walker" and "improv[ement]" on physical exam).)

That said, Dianne's final argument here—that the ALJ improperly assessed her activities of daily living—warrants closer inspection. Daily activities generally must be considered "with care," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), so before an ALJ can hold such activities against a claimant, he must "explain the 'inconsistencies' between [the] activities . . . complaints of pain, and the medical

13

evidence," *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001), and address any limitations in the claimant's performance of those activities, *see, e.g.*, *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding where ALJ ignored claimant's qualifications as to how he carried out activities). Here, besides stating generally that he found Dianne's allegations inconsistent with her activities and specifically addressing her report that she walked all day, the ALJ says nothing about her activities at all. (A.R. 26, 28-29.) As Dianne points out, the ALJ failed to address how her December 2018 reports of difficulty dressing and bathing, ability to prepare only simple meals, and inability to complete household chores, and testimony that she was approved for a home health care after her 2021 vertebral fracture, square with her symptom allegations. (R. 14, Pl.'s Mem. at 12-13 (citing A.R. 51-52, 429-31); R. 16, Pl.'s Reply at 13 (same).) As such, the court cannot trace the ALJ's path of reasoning from Dianne's daily activities to his conclusions about the same.

Nevertheless, an "ALJ's credibility assessment need not be perfect; it just cannot be patently wrong." *Dawson v. Colvin*, No. 11 CV 6671, 2014 WL 1392974, at *10 (N.D. Ill. April 14, 2014) (citing *Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013)). Having relied on more than Dianne's activities to discount her symptom allegations, the ALJ cleared that low bar. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (affirming symptom assessment despite flawed activities analysis since "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are") (emphasis in original). Remand is not required on this basis.

14

## C. Physical RFC Assessment

Dianne next complains about the ALJ's physical RFC assessment. An RFC measures the tasks a person can perform given his or her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). The ALJ must incorporate a claimant's limitations, including those that are not severe, in developing the RFC, and may not simply dismiss a line of evidence that is contrary to the ruling. *See Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In so doing, the ALJ must "say enough to enable review of whether [he] considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), providing a "logical bridge" between the evidence and his conclusions, *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

Dianne says the ALJ failed to "set forth a supported basis" for finding she can sit for six hours during the workday. (R. 14, Pl.'s Mem. at 7-8.) She notes APRN Scoigletti's opinion that she can sit for less than two hours per workday and her own testimony that she can sit for just 10 minutes at a time and spends most of the day lying down. (Id. at 7.) She also argues it was improper for the ALJ to conclude she can sit for six hours based on her report to the consultative examiner that she had mild difficulty sitting for more than an hour at a time. (Id. at 8.) But the ALJ relied on the consultants' opinions to arrive at a six-hour sitting limitation, not Dianne's report to the consultative examiner, which in any case clearly contradicts her other reports that she can only sit for only 10 minutes. Moreover, the court already rejected

15

Dianne's contentions concerning the opinion evidence, including that more recent evidence would have changed the state agency consultants' opinions. In sum, Dianne's complaints about the sitting limitation amount to another improper request to have this court reweigh evidence. *See Gedatus*, 994 F.3d at 900.

**D.     Mental RFC and Past Work Assessment**

Finally, Dianne argues the ALJ failed to properly analyze her ability to return to skilled and semi-skilled past work as a typist, apartment manager assistant, or charter representative. Dianne points out that the ALJ found mild mental limitations yet did not account for them in her RFC or explain how she could perform the past jobs notwithstanding those limitations. (R. 14, Pl.'s Mem. at 11; R. 16, Pl.'s Reply at 9.) The government responds that the ALJ is not required to include functional restrictions based on a paragraph B criteria rating alone and that the medical evidence supports no such RFC limitation here. (R. 15, Govt.'s Mem. at 3.) Maybe not, but the ALJ must explain why, and he failed to do so. The ALJ's conclusion on the step-two analysis includes a familiar boilerplate stating that:

> [t]he limitations identified in the "paragraph B" criteria are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental [RFC] used at steps 4 and 5 . . . requires a more detailed assessment. The following [RFC] assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(A.R. 20.) Yet the ALJ did not conduct the "more detailed assessment" of Dianne's mental RFC he promised thereafter. Rather, the ALJ merely notes that he was persuaded by the consultant's opinions that Dianne is mildly limited in interacting with others and adapting or managing herself and stated in conclusory fashion that

16

his RFC assessment is "supported by the record as a whole, which indicates claimant's limitations will not interfere with her ability to function independently, appropriately, effectively, and on a sustained basis" within that RFC. (Id. at 28.) Importantly, the ALJ's ultimate non-disability decision rests on his finding that Dianne can perform her skilled and semi-skilled past work, (id. at 29), and the VE testified that this work would not be available to a person with certain mental limitations, (id. at 59 (finding that individual limited to simple tasks, simple work-related decisions, and occasional interaction with coworkers, supervisors, and the public could not perform Dianne's past work)). As such, and because the ALJ failed to explain why the mild mental limitations he found did not translate to functional limitations in his RFC, this matter must be remanded so the ALJ may do so and consider any new RFC assessed against Dianne's past work. *See Anthony W. v. Kijakazi*, No. 20 CV 6209, 2022 WL 1062334, at *5 (N.D. Ill. April 8, 2022) (remanding because ALJ failed to "articulate how she reasoned through [claimant's] mild [mental] functional limitations and her finding that he could return to his past skilled and semi-skilled work"); *Brenda R. v. Kijakazi*, No. 20 CV 7498, 2023 WL 3689458, at *6 (N.D. Ill. Jan. 19, 2024) (ALJ's failure to sufficiently explain why RFC did not include mild paragraph B limitations "particularly troubling" since non-disability determination was based on ALJ's finding that claimant could engage in past skilled work); *Thomas G. v. Kijakazi*, No. 20 CV 5860, 2022 WL 4234967, at *5 (N.D. Ill. Sep. 14, 2022) ("[O]n remand, the ALJ must either incorporate non-exertional restrictions

17

into the RFC that account for Claimant's mild limitations in each of the four broad areas of mental functioning, or explain why such limitations are unwarranted.").

## Conclusion

For the foregoing reasons, Dianne's remand request is granted, and this matter is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim
United States Magistrate**